## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No. 09-2864 - White

UNITED STATES OF AMERICA

vs.

YOSBEL BUSCARON,

    **and**

LAZARO FERNANDEZ,

    **Defendants.**

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the United States Attorney's Office prior to April 1, 1999? ____ Yes __x__ No
   If yes, was it pending in the Central Region?
   ___ Yes ____ No

2. Did this matter originate from a matter pending in the United States Attorney's Office prior to April 1, 2003? ____ Yes __x__ No

3. Did this matter originate from a matter pending in the Narcotics Section (Miami) of the United States Attorney's Office prior to May 18, 2003? ____ Yes __x__ No

4. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? ____ Yes __x__ No

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

BY: _____
BRIGHAM CANNON
TRIAL ATTORNEY
UNITED STATES DEPARTMENT OF JUSTICE
1400 New York Ave., NW
Washington, D.C. 20005
TEL: (202) 307-0593
FAX: (202) 514-6118

# *United States District Court*

_____ SOUTHERN _____    **DISTRICT OF** _____ FLORIDA _____

**UNITED STATES OF AMERICA**

**v.**

**YOSBEL BUSCARON**

**AND**

**LAZARO FERNANDEZ**

**CRIMINAL COMPLAINT**

**CASE NUMBER:** O9-2864- White

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From in or about October 2008 through the present, in the Southern District of Florida, the defendants, YOSBEL BUSCARON and LAZARO FERNANDEZ, did unlawfully, knowingly and intentionally combine and conspire together and with others to defraud the United States Government, in violation of Title 18, United States Code, Section 371.

I further state that I am a Special Agent with Federal Bureau of Investigation and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT**

JOSEPH P. GORDON, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me, and subscribed in my presence,

June 24, 2009 _____    at    Miami, Florida _____
**Date**                                        **City and State**

UNITED STATES MAGISTRATE JUDGE
PATRICK A. WHITE _____    _____
**Name and Title of Judicial Officer**            Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT, A CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Joseph P. Gordon ("Affiant") being duly sworn, depose and state as follows:

### PRELIMINARY INFORMATION

1.     I am an investigative and law enforcement agent authorized to investigate violations of the laws of the United States and to execute arrest and search warrants issued under the authority of the United States.

2.     I am a Special Agent of the FBI and have been so employed since March 2002. I am assigned to the Washington Field Office and am currently assigned to a white collar crime squad. I have been trained in white collar crime and have experience in cases relating to various types of fraud, including conspiracies to defraud the United States government. In my seven years as a Special Agent with the FBI,, I have prepared, assisted and/or participated in the execution of numerous search and arrest warrants.

3.     This Affidavit is written in support of an application for a warrant to search the business known as INNOVATIVE COMMUNICATIVE SERVICES FOR THE DEAF, CORP. ("ICSD"), located at 7850 NW 146th Street, Suite 409, Miami Lakes, FL 33016 (the "Subject Location"), as more fully described in the accompanying Attachment A, and incorporated herein by reference, and seize computers and other evidence of the criminal conduct of agents, owners and employees of ICSD, as more fully described in Attachment B, and incorporated herein by reference.

4.     Based on the facts and circumstances described in this Affidavit, I respectfully submit that there is probable cause to believe that there is presently contained within the Subject Location, records, files, correspondence, memoranda, computers, computer disks, bank and other financial records, data, and

other materials that constitute evidence of, the fruits of, or instrumentalities of various criminal violations,

including, but not limited to violations of Title 18, United States Code, Section 371 (conspiracy to

defraud the United States), Title 18, United States Code, Section 287 (false claims to an agency of the

United States), Title 18, United States Code, Section 641 (Theft of Government Property),  Title 18,

United States Code, Section 1341 (Mail Fraud),  Title 18, United States Code, Section 1343 (Wire

Fraud), and conspiracies to commit the offenses described above.

5.     This Affidavit is also written in support of criminal complaints and arrest warrants for the two

owners of ICSD, YOSBEL BUSCARON ("BUSCARON") and LAZARO FERNANDEZ

("FERNANDEZ").  Based on the facts and circumstances described in this Affidavit, I respectfully

submit that there is probable cause to believe that BUSCARON and FERNANDEZ violated Title 18,

United States Code, Section 371, in that BUSCARON and FERNANDEZ, within the Southern

District of Florida and elsewhere, unlawfully, knowingly, and intentionally combined and conspired

together and with others to defraud the Federal Communications Commission and its agent, the

National Exchange Carrier Association.

6.     The facts and information contained in this Affidavit are based on my knowledge and

observations, information obtained from records obtained in the course of this investigation, information

from other experienced FBI agents and experienced investigators of the Federal Communications

Commission's ("FCC") Office of Inspector General ("OIG") - including transcripts of witness

interviews conducted by the FCC-OIG, and information gained from my personal training and

experience.

2

7.      Because this Affidavit is being submitted for the limited purposes of establishing probable cause

to obtain a search warrant and to support a criminal complaint and arrest warrants, I have not set forth

each and every fact learned during the course of the investigation. In addition, where conversations or

statements are related herein, they are related in substance and in part except where otherwise

indicated.

## BACKGROUND

8.      In 1990, the Americans with Disabilities Act ("ADA") required that certain telecommunication

companies provide Telecommunications Relay Services ("TRS") to help deaf and hard of hearing

individuals communicate with hearing individuals "in a manner that is functionally equivalent to . . . voice

communication services."[1] A nationwide TRS program began in 1993. Video Relay Service ("VRS")

is a specific type of TRS and is the service that is the subject of this investigation.

9.      VRS is an online video translation service that allows people with hearing disabilities to

communicate with hearing individuals online with the use of interpreters and web cameras. A person

with a hearing disability who wants to communicate with a hearing person can do so by contacting a

VRS provider through an audio and video internet connection. The VRS provider, in turn, provides a

Video Interpreter ("VI") to view and interpret the person's signed conversation and relay the

conversation orally with a hearing person. VRS is funded by fees assessed by telecommunications

providers to their customers and is provided at no cost to the VRS user. Specifically, VRS services

are funded by charges to consumers' phone bills, listed as regulatory fees, that go into the TRS Fund,

---

[1]      47 U.S.C. § 225(a)(3).

3

which is overseen by the FCC and administered by the National Exchange Carrier Association

("NECA"). Providers of VRS services are paid for their services from the TRS Fund. The TRS Fund

currently reimburses VRS providers at the rate of $6.73 per minute for the first 50,000 minutes billed in

any given month, $6.46 per minute for minutes 50,001 through 500,000, and $6.26 per minute for all

minutes over 500,000.

10.     The FCC-OIG has tracked a dramatic increase in the reimbursements the TRS Fund has paid

out to VRS providers. For example, in January 2005, the TRS Fund paid providers approximately

$10.8 million in connection with the billing of approximately 1.4 million VRS minutes, and by January

2009, the TRS Fund paid providers approximately $51.2 million in connection with the billing of

approximately 8.1 million VRS minutes. Based in part on this dramatic increase in reimbursements, as

well as on complaints from VIs in the VRS industry, the FCC-OIG, and later the FBI, began

investigating allegations of fraud described more fully below, including allegations that VRS providers

were fraudulently generating minutes for which they would then seek and receive reimbursement from

the TRS Fund.

## RELEVANT ENTITIES AND INDIVIDUALS

11.     NECA is a non-profit association responsible for, among other things, administering the TRS

Fund, including reimbursements for VRS. NECA is headquartered in Whippany, New Jersey. VRS

providers that are certified by the FCC to receive payment for VRS submit their monthly requests for

payment along with the required backup documentation to NECA and are paid out of the TRS Fund, a

function that the FCC has contracted to NECA. NECA currently

4

requires that VRS providers include call detail records for each billed call, which includes the date, time, originating phone number or IP address,[2] destination number, and call duration.

12.     Company 1 is a certified VRS provider based in Flint, Michigan. Company 1 provides VRS through its own call centers and also contracts with outside entities to operate VRS call centers. The minutes from the contracted call centers are billed by Company 1 to NECA with the payments for those calls divided between Company 1 and the contracted call center. In 2008, Company 1 was paid more than $38.7 million for VRS services purportedly provided by Company 1 and its contracted call centers.

13.     Company 2 is a Delaware corporation established in 2005 and is headquartered in Rockville, Maryland. According to NECA, Company 2 operates call centers, or subcontracts to others the operation of call centers in, among other places, Rockville, Towson, and Baltimore, Maryland, Austin, Texas, New York City, New York, and Colonia, New Jersey. Company 2 is not a certified VRS provider that can bill directly to NECA/FCC. Instead, beginning in 2006, Company 2 billed for VRS through Company 1. According to Company 1's representation to the FCC, in 2008, Company 2 was responsible for approximately 60% of the VRS minutes billed by Company 1.

14.     ICSD is a business registered in Florida as a Domestic Limited Liability Company. The company registered its principal address with the Florida Department of State Division of Corporations

---

[2]An IP address identifies the computer from which the caller is calling. Because these calls are made over the internet, the IP address of the caller is generally used as the identifier for record-keeping purposes.

5

as 15476 NW 77th Ct, Suite 190, Miami Lakes, FL. From surveillance performed by Affiant, this address is a private post office box. According to the Florida Department of State Division of Corporations as well as individuals interviewed by Affiant, BUSCARON and FERNANDEZ are the officers and owners of ICSD. According to interviews with former employees and surveillance performed by Affiant and others, ICSD has its corporate offices and operates a call center at 7850 Northwest 146th Street, Suite 409, Miami Lakes, FL 33016, the Subject Location. On February 9, 2009, a press release from Company 2 announced that they had created a partnership with ICSD, a Miami based sign language interpreting company, to provide a Spanish language capability in providing VRS. The press release contained contact information for BUSCARON at ICSD.

15.     Video Interpreter #1 ("VI1") is a certified ASL interpreter who was hired by Company 2 in or about October 2006 to be a VI at Company 2's Rockville, Maryland call center. VI1 worked in Rockville, Maryland for Company 2 until in or about May 2007.

16.     Video Interpreter #2 ("VI2") is an ASL interpreter who was hired by FERNANDEZ as an interpreter for ICSD in or about October 2008 and then worked as a VI through in or about March 2009. VI2 was trained by Company 2 personnel and BUSCARON.

17.     Video Interpreter #3 ("VI3") is a certified ASL interpreter who was hired by ICSD in or about November 2008 and worked as a VI through in or about March 2009. VI3 was trained using a Company 2 PowerPoint presentation.

18.     Video Interpreter #4 ("VI4") is a certified ASL interpreter who was hired by ICSD in or about November 2008 and worked as a VI through in or about April 2009. VI4 was trained by BUSCARON.

6

19.     Video Interpreter #5 ("VI5") is an ASL interpreter who was hired by ICSD in or about

December 2008 and worked as a VI through in or about February 2009.  VI5 was trained by

BUSCARON.

## THE SCHEME

### Fraudulent VRS Minutes at Company 2's Rockville Call Center

20.     According to VI1, when VI1 began working at Company 2 in or about October 2006,

Company 2 employed approximately 25-30 VIs.  Only three, including VI1, were certified, and the

rest were between 18 and 22 years old and had little experience in interpreting.  VI1 received little

training when VI1 started.

21.     Beginning in or about October 2006, VI1 noticed that when VRS calls were in progress, the

VIs were often not interpreting the calls, and, in some cases, the VIs were not even at their stations.  In

one of VI1's first VRS calls, the caller instructed VI1 to call a number that reached an informational

recording.  The caller told VI1 that VI1 did not need to interpret the call and that the call would just

"run."  VI1 and others who worked for Company 2 referred to these calls as "revenue calls," and other

VIs interviewed by investigators referred to these as "run calls" or "running calls."  When VI1 told the

caller that VI1 had to interpret the call, the caller told VI1 that VI1 must be new, and that VI1 could go

get a coffee or take a break.

22.     These "run calls" continued throughout VI1's employment.  VI1 explained to investigators that

7

many of the calls that VI1 processed at Company 2 were to numbers where the

caller was placed on interminable hold, to podcasts,[3] or to radio broadcasts, and the callers would

instruct the VIs to not interpret these calls, which often lasted for hours at a time.[4]

23.     VI1 complained to VI1's supervisors who told VI1 that VI1 should be interpreting calls even if

the callers asked VI1 not to do so.  Soon after these complaints, VI1 noticed that callers less frequently

asked that VI1 not interpret the calls, but callers still asked to be connected to the same types of phone

numbers that they had been using before, when they requested that VI1 not interpret the calls.  VI1

reported that even though the callers did not continue to request that VI1 not interpret, the callers

involved in these calls were not paying attention to VI1's interpretation.  In addition, VI1 noticed that

the length of each illegitimate call decreased, but the caller would disconnect and call right back to be

connected to a different, but still illegitimate call.  So, for example, instead of one five-hour illegitimate

call, a caller would make five one-hour illegitimate calls.

24.     VI1 would sometimes interact with callers outside the purported interpreting part of the call.

Many of the callers involved in the illegitimate calls told VI1 and, according to VI1, told other VIs, that

they were friends of one of Company 2's owners.  One caller who called almost on a daily basis, and

who never wanted VI1 to interpret his calls, told VI1 that he was a friend of one of the owners.  This

same caller told VI1 that he was making the run calls to support Company 2, and that he was being

---

[3]     Podcasts are essentially recordings, like, for example, a recording of a radio program
or a person reading a novel.

[4]     Based on current VRS reimbursement rates, a 60 minute VRS call would be billed by
Company 2 to the FCC, through NECA, at the rate of $403.80.

8

paid $20 an hour to make the calls.

25.     VI1 also reports that Company 2 hired deaf individuals from a local university to work at Company 2's headquarters.  According to VI1, the individuals were supposedly hired for marketing and would work out of an office at Company 2's headquarters equipped with the ability to make VRS calls.  According to VI1, however, these individuals involved in "marketing," were making the same types of illegitimate run calls to podcasts or recordings, for, what appeared to VI1, the sole purpose of generating money for Company 2.

26.     As another example of illegitimate calls, VI1 reports that the receptionist at Company 2's headquarters would use Company 2 VRS to make run calls.  The receptionist apologized to VI1 for making the run calls, but explained that she had to do it because her boss told her to.

27.     According to VI1, VI1 had conversations with other VIs who reported the same kinds of problems with the run calls.  VI1 estimates that when VI1 first started at Company 2, approximately 90% of the calls were run calls.  VI1 believes that the percentage of run calls reduced slightly with time, but that when VI1 stopped working at Company 2, 75%-80% of the calls were still run calls.

*Fraudulent VRS Minutes at Company 2 Subcontractor ICSD*

28.     According to Company 2's press release, as well as interviews with ICSD VIs, including those described in this Affidavit, ICSD provides VRS call center services for Company 2 VRS customers. Though the division of the per minute NECA reimbursement between Company 2 and ICSD is unknown to the Affiant, Affiant is aware that in another Company 2 relationship with a call center, the call center received approximately $2 for every VRS minute processed by the call center and billed to

9

NECA.

29.    According to VI2, VI3, VI4 and VI5, ICSD, and at the direction of BUSCARON and

FERNANDEZ, is processing and encouraging the same types of fraudulent run calls described above.

VI2, VI3, VI4 and VI5 were often asked by VRS callers to not interpret, but to leave the call running.

30.    On some occasions, a run call would end and the caller would not have another number to call.

According to VI3, ICSD management, including BUSCARON and FERNANDEZ provided VIs with

lists of numbers, which the VI could use when the caller did not have another number.  VI3 also reports

that BUSCARON and FERNANDEZ instructed VI3 to keep the caller on the line and to make

personal phone calls or call any number which VI3 could come up with.  For example, in March 2009,

VI3 was told by BUSCARON and FERNANDEZ to call all of the Home Depots in the area and

inquire about tile in stock.

31.    Both VI3 and VI5 told investigators that they recognized that some of the run callers had a

connection to the call center.  VI5, for example, recognized one of the run callers as the mother of

another ICSD VI.  Similarly, VI3 told investigators that she believed one of the run callers to be related

to BUSCARON.  VI3 reported that when on a call with the BUSCARON-related caller, VI3 could

see on VI3's screen and in the background of the caller that the caller had other computers also making

calls.  On the other screens at the caller's home, VI3 could see the faces of other ICSD VIs, which

meant that the caller was on more than one ICSD VRS call at a time.

32.    VI2 and VI3 advised investigators that each ICSD VI had a unique login name and password

10

with which the VI accessed a VRS workstation. VI3 was aware that ICSD owners also used fake VI logins to run calls without a VI providing interpretation. VI3 explained that if a legitimate call was in the queue for an unoccupied workstation, a VI would have to move to that station to interpret the legitimate call. VI3 also reported that VI3 would sometimes come to work and find that VI3 was already logged in and that VI3's login was being used to process run calls.

33.     According to VI3 and VI5, there were other employees of ICSD who would make run calls to the ICSD VIs from ICSD computers. According to VI5, this was done at the direction of both BUSCARON and FERNANDEZ.

34.     VI2 and VI4 have described the same kinds of activities at ICSD, including instructions from BUSCARON and FERNANDEZ to never hang up on a call, and telling the VIs that they need not interpret.

35.     VI3 has friends that are still employed at ICSD and who have told VI3 that the illegitimate calls are still occurring.

## C.     ICSD VRS minutes billed through Company 1

36.     I have reviewed Company 1's monthly bills to NECA from January 2008 through April 2009, the most recent month available. These bills break down the total VRS minutes billed into minutes billed by each particular call center, identified by a NECA-assigned number. According to those bills, and information that I have received from NECA identifying the location of particular call centers, I know that ICSD VRS minutes were first billed in October 2008. In that month ICSD billed approximately 91,000 VRS minutes, and was immediately Company 2's second-highest VRS minute-generating call center. Soon ICSD became Company 2's highest billing call center, with approximately

11

180,000 VRS minutes in February 2009 and 156,000 VRS minutes in March 2009.

37.     In April 2009, ICSD began operating out of the Subject Location and billed approximately 78,000 VRS minutes from that location. The Subject Location is located in a multi-story office building. The first floor has a directory of businesses in the building and lists ICSD as occupying Suite 409. Recent surveillance of the Suite identifies a solid door identified only by the suite number. Investigators saw a man fitting BUSCARON's description standing in front of the door to Suite 409 using ASL with another individual. Recent surveillance has also shown that vehicles registered to BUSCARON and FERNANDEZ are parked in the lot during normal business hours.

38.     Based on my training and experience, and based on information obtained in the course of the investigation, I believe that ICSD's corporate headquarters is located at the Subject Location and that there is probably cause to believe that evidence of the scheme to generate fraudulent VRS minutes located there, including ICSD corporate information and records of financial relationships with Company 2 and the run callers.

39.     From October 2008 through April 2009, ICSD has billed NECA, through Company 2 and Company 1, for approximately 900,000 VRS minutes.

### SCOPE OF SEARCH

40.     Based on my training and experience, and the training and experience of other investigators assigned to this case, I know that it is common for individuals involved in financial crime to maintain financial documents and records relating to their personal and business affairs. These documents will show the acquisition, conversion, movement, secretion, transfer, and distribution of currency, real property, and personal property. It is also common for such persons to maintain financial instruments

12

that are the proceeds of, or facilitating property of, the illegal activity.  These documents, records, and

financial instruments are often retained for long periods of time in secure and accessible locations,

including in businesses.

41.     Based on my training and experience, and the training and experience of other investigators

assigned to this case, I also know that participants in financial fraud schemes often keep different sets of

books to record the transfer of funds into and out accounts related to the fraud scheme and to keep

track of how the proceeds are distributed among and between the participants.

42.     Based on the widespread and consistent scheme to generate fraudulent VRS minutes at ICSD,

there is probable cause to believe that there would be evidence of, the fruits of, or

instrumentalities of the crimes being investigated in this case at the Subject Location, more particularly

described in Attachment A.

43.     Based on my training and experience, the training and experience of other agents assigned to

this case, and the facts described above, there is probable cause to believe that there will be records or

documents tracking VRS calls to ICSD, including which VIs interpreted the calls, created on and

stored in business or office computers or electronic media located at the Subject Location.  The

records or documents created and retained by individuals in financial crime also often include

correspondence with co-conspirators; U.S. Postal Service and/or next day carrier services documents

and receipts; investor records; contracts; Rolodex files; photographs; appointment books; airline and

other travel tickets and receipts; bank accounts records; and financial instruments.

44.     Based on my training and experience, the training and experience of other agents assigned to

this case, individuals involved in financial crime create such documents, records, and information by

various means, including, but not limited to, computers, printers, telex machines, facsimile machines, and telephones, telephone answering machines, cellular phones, and cameras. These individuals also maintain such documents, records, and information in various forms, including but not limited to, electrical, magnetic, photographic, and tangible.

45.     Based on my training and experience, and the training and experience of other investigators assigned to this case, there is probable cause to believe that email communication as well as instant messaging communications to, by and between ICSD employees contains evidence of, the fruits of, or instrumentalities of the crimes being investigated in this case.

46.     To promptly retrieve and analyze all electronically stored computer data, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, an analysis, both on site and in a laboratory, should be done by a qualified computer specialist.

47.     To effect such accuracy and completeness requires the seizure of all computer equipment and peripherals, the software to operate them, and related instruction manuals.

48.     Based on my personal experience and consultation with Special Agents from the FBI Computer Analysis Response Team ("CART"), I know that:

(a) Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits or evidence of criminal activities, and/or (2) the objects may have been used to store and collect information about criminal activities (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the

14

government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (A) instrumentalities, fruits, or evidence of criminal activities; or (B) storage devices for information about criminal activities;

(b) Computer hardware and software may be utilized to store records, including but not limited to, records relating to business activities, criminal activities, associate names and addresses, and the identity and location of assets illegally gained through criminal activity. These records may be more fully described as information or data stored in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. This media includes, but is not limited to, fixed hard drives, removable hard drives, diskettes, compact discs (CDs), digital versatile disks (DVDs), universal serial bus (USB) storage devices, and other related media capable of storing magnetic coding;

(c) Computer hardware and software may be utilized for purposes of communication among persons involved in criminal activity. These communications include, but are not limited to: e-mail, voice mail systems, facsimile software, paging software, and other systems whereby communications or messages may be communicated. These systems may be networked together or facilitated through a third party commercial system;

(d) Computer hardware may be described as any and all electronic devices capable of creating, converting, displaying, transmitting or analyzing magnetic or electronic impulses or data. These devices include, but are not limited to computers and computer peripherals, such as printers, modems, and other electronic devices;

(e) Computer software may be described as any and all programs or instructions capable of

15

interpretation by a computer and related devices which is stored in the form of magnetic or electronic media. These items include, but are not limited to, application software, operating systems, programs, compilers, interpreters and other programming utilized to communicate with computer components; and

(f)  In order to completely and accurately retrieve data maintained in computer hardware or computer software, to insure accuracy and completeness of such data and to prevent the loss of the data either from accidental or programmed destruction, it is necessary that all computer equipment, including peripherals, as well as software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting. Temporary removal of equipment from the premises during this examination is necessary because computer-based evidence is quickly and easily destroyed.

49.    The search procedure of the electronic data contained in computer operating software and/or hardware, or memory devices, performed in a laboratory, or in other controlled environment, may include the following techniques:

(a) Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

(b) "Opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

(c)  "Scanning" storage areas to discover and possibly recover recently deleted data;

(d)  Scanning storage areas for deliberately hidden files; and/or

16

(e) Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

## CONCLUSION

50. Based on the facts set forth above, I respectfully submit that there is probable cause to believe that there is presently contained within the Subject Location, described in Attachment A to this Affidavit, files, correspondence, memoranda, computers, computer disks, bank and other financial records, and other materials that constitute evidence of, the fruits of, or instrumentalities of various criminal violations, including violations of Title 18, United States Code, Section 371 (conspiracy to defraud the United States), Title 18, United States Code, Section 287 (false claims to an agency of the United States), Title 18, United States Code, Section 641 (Theft of Government Property), Title 18, United States Code, Section 1341 (Mail Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), and conspiracies to commit the offenses described above. Accordingly, I respectfully request that a search warrant be issued for the Subject Location described in Attachment A to this Affidavit.

51. Based on the facts set forth above, I respectfully submit that there is probable cause to believe that BUSCARON and FERNANDEZ, within the Southern District of Florida and elsewhere, unlawfully, knowingly and intentionally agreed, combined and conspired together and with others to defraud the FCC and its agent, NECA, in violation of Title 18, United States Code, Section 371.

Joseph P. Gordon
Special Agent

17

Federal Bureau of Investigation
Washington, D.C.

Subscribed and sworn to before me this __24th__ day of June 2009

PATRICK A. WHITE
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

### Description of Location to Be Searched

The premises at 7850 NW 146th Street, Suite #409, Miami Lakes, Florida 33016 (the "Subject Location"). The Subject Location is located in a multi-story office building. The first floor has a directory of businesses in the building and lists ICSDeaf as occupying Suite 409. Recent surveillance of the Suite identifies a solid door with no identification other than the suite number.

**ATTACHMENT B**

**Description of Items to Be Seized**

Any and all documents and records relating to ICSD's provision of VRS for the period of

October 1, 2008[1] through to the present, which constitute evidence of violations of Title 18, United

States Code, Section 287 (false claims to an agency of the United States), Title 18, United States

Code, Section 641 (Theft of Government Property),  Title 18, United States Code, Section 1341 (Mail

Fraud),  Title 18, United States Code, Section 1343 (Wire Fraud), and conspiracies to commit the

offenses described above, including, but not limited to, the following:

1.      Files and their included documents that relate to the documentation of ICSD VRS minutes,

        including, but not limited to: (a) documents and records related to ICSD's submission, through

        Company 2 and Company 1, to NECA of its minutes for reimbursement; (b) documents and

        records related to call centers both owned and operated by ICSD and those with which ICSD

        is affiliated and the VRS minutes generated by those call centers; (c) documents and records

        related to VIs employed by ICSD or ICSD affiliates and the VRS minutes processed by those

        VIs; and (d) documents and records related to VRS minutes generated by particular callers;

2.      Files and their included documents that relate to ICSD's marketing and promotion of its VRS,

---

[1]While this date limitation will be generally applicable, some documents and records that
pre-date October 1, 2008, would be within the scope of this search warrant and description of items to
be seized.  For example, if ICSD personnel files straddle the October 1, 2008 date, the entire
personnel file would be subject to seizure both to preserve the integrity of the file, and because
information included in that file, even though it was generated before October 1, 2008, could constitute
evidence of the scheme to defraud described in the affidavit.  Or, in another example, documents
relating to the genesis of ICSD's relationship with VRS and Company 2 might pre-date October 1,
2008, and be within the scope of this search warrant and description of items to be seized.

including related agreements or contracts with other individuals or entities for marketing services and any documents or records regarding payment for those services;

3. Any and all lists or records showing the employment by ICSD or on ICSD's behalf, of all its officers, directors, employees, agents, representatives, independent contractors, affiliates, including, but not limited to, personnel files, employee/agent lists, personnel organizational charts, independent contractor agreements, employment contracts, compensation documents, employment applications, personnel documents showing the name, address, telephone number, title and other pertinent information concerning all of ICSD's officers, directors, employees, agents, representatives, independent contractors and affiliates;

4. Address and Telephone Information: Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, of ICSD agents, employees, officers, affiliates, associates and financial institutions;

5. Computer hardware, consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, "palm pilots", I-pods, memory facsimile machines and "schedulers"); internal and peripheral storage devices (such as fixed disks, external hard drives, floppy disk drives and diskettes, USB storage devices, optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and any and all storage devices); peripheral input/output devices (such as

keyboards, printers, scanners, video display monitors, mouse devices); and related

communications devices (such as modems, cables and connections, recording equipment, RAM

or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access

to computer hardware (such as physical keys and locks);

6.    Computer software, that is, digital information which can be interpreted by a computer and any

of its related components to direct the way they work. Software is stored in electronic,

magnetic, optical, or other digital form. It commonly includes programs to run operating

systems, applications (like word processing, networking, graphics, accounting, presentations or

spreadsheet programs), utilities, compilers, interpreters, and communications programs;

7.    Computer passwords and other data security devices, that is, a string of alphanumeric

characters designed to restrict access to or hide computer software, documentation, or data.

Data security devices may consist of hardware, software, or other programmable code. A

password usually operates as a sort of digital key to "unlock" particular storage data security

devices. Data security hardware may include encryption devices, chips, and circuit boards.

Data security software or digital code may include programming code that creates "test" keys

or "hot" keys, which perform certain pre-set security functions when touched. Data security

software or code may also encrypt, compress, hide, destroy or "booby-trap" protected data to

make it inaccessible or unusable, as well as reverse the process to restore it;

8.    Logs of electronic communications, disks of communications, hard copies of communications

and e-mail communications relating to the aforementioned items;

9.    Any documentation concerning the use of the mails or interstate wires relating to the items

4

sought above, including, but not limited to, letters, forms, notes, facsimiles, e-mails, pamphlets, invoices, mailing or federal express receipts, and remittances; and

10. Any documents relating to the transfer and disbursement of monies, funds, stock and financial instruments from the above described activities, including but not limited to, ledgers, books, records, correspondence, applications, checks, money orders, wiring instructions, facsimile transmissions, e-mails, notes, or receipts.

The terms "documents," "records," and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

5